**SAINT LOUIS UNIVERSITY and
Paulo Bicalho, M.D.,
Appellants,**

v.

**Alice GEARY, Individually and as Personal Representative of the Estate of Phillip Sgroi, Respondent.**

No. SC 89840.

Supreme Court of Missouri,
En Banc.

Nov. 17, 2009.

Robyn Greifzu Fox, Philip L. Willman, Catherine Vale Jochens, St. Louis, MO, for appellants.

Derek H. Potts, Patricia L. Campbell, Jeffrey M. Kuntz, Kansas City, MO, for respondent.

PATRICIA BRECKENRIDGE, Judge.

Saint Louis University ("SLU") and Paulo Bicalho, M.D., appeal the judgment in favor of Phillip Sgroi and his wife, Alice Geary, in a medical negligence action. A jury found Dr. Bicalho negligent for failing to timely diagnose and treat Mr. Sgroi's fractured hip and found SLU, Dr. Bicalho's employer, vicariously liable for his negligence. SLU and Dr. Bicalho present three issues on appeal: error in the admission of videotape evidence, highlighting the issue of insurance by an improper question during voir dire, and juror nondisclosure.

The trial court's judgment is affirmed. The trial court's erroneous admission of videotape evidence did not prejudice SLU and Dr. Bicalho; the trial court did not abuse its discretion in denying a request for a mistrial because of an improper insurance question; and the trial court did not err in overruling a motion for a new trial for unintentional juror nondisclosure.

## Factual and Procedural Background

In 2000, Mr. Sgroi suffered a stroke that affected his left side and caused him to lose the ability to walk. After months of rehabilitation, Mr. Sgroi regained the ability to walk fifty feet with a walker, rake leaves from his wheelchair, get in and out of a vehicle, attend lectures and movies, and go to restaurants. Thereafter, while on a trip, Mr. Sgroi slipped and fell on his left side. When he sought emergency treatment, he was diagnosed with a left arm fracture and a left knee contusion. Mr. Sgroi returned to St. Louis two days later and was admitted to SLU Hospital. Upon discharge, he received inpatient rehabilitation therapy.

Mr. Sgroi subsequently was readmitted to SLU Hospital for gastrointestinal issues and severe knee pain. Mr. Sgroi's wife, Ms. Geary, requested an orthopedic consult because of her concern for his level of pain and disability. On February 19, 2002, Dr. Bicalho, an orthopedic surgeon, examined Mr. Sgroi for his complaint of severe pain in his left knee. Dr. Bicalho ordered X–rays of Mr. Sgroi's left knee, but not of Mr. Sgroi's left hip. The X–ray films did not show any fracture, dislocation, or joint effusion in Mr. Sgroi's left knee. Dr. Bicalho diagnosed Mr. Sgroi with left knee pain and recommended that Mr. Sgroi be sent home with continued physical therapy.

After a few days, Mr. Sgroi was discharged from SLU Hospital and sent home. While at home, he was in extreme pain and completely bedridden. After a week passed, Mr. Sgroi could not straighten his lower left leg due to pain. By March 21, 2002, Mr. Sgroi's pain was so bad that he returned to SLU Hospital, complaining of worsening pain in his left leg from the mid-femur to the knee. That day, an X–ray was taken that revealed a femoral fracture that was weeks old. The fracture was sufficiently old that it would have existed at the time of Dr. Bicalho's consultation.

At the time of his latest admission, Mr. Sgroi also was suffering from a severe urinary track infection, muscles atrophied from lack of use, and a decubitus ulcer from lying in bed. As a result, surgery for the fracture had to be postponed. Mr. Sgroi eventually underwent a left hemiarthroplasty in which he received a prosthetic femur head. After he was discharged from SLU Hospital, Mr. Sgroi began several years of physical therapy, during which he temporarily regained his ability to walk short distances with a walker. Mr. Sgroi eventually ended his therapy because his hip pain had progressed to the point that it was too painful for him to stand or even get out of bed.

Mr. Sgroi subsequently underwent another hip surgery, during which it was discovered that he suffered from an infected hip prosthesis and infected hip joint. Due to the infection, Mr. Sgroi's hip prosthesis and hip joint had to be removed during the surgery. As a result of the loss of his hip joint, Mr. Sgroi permanently lost the ability to walk.

Mr. Sgroi and Ms. Geary sued SLU, Dr. Bicalho, and others, alleging Mr. Sgroi's healthcare providers were negligent in failing to timely and properly diagnose and treat his hip fracture.[1] Mr. Sgroi claimed that Dr. Bicalho was negligent in failing to diagnose and treat his hip fracture during the February 19, 2002, consultation, and that SLU, as Dr. Bicalho's employer, was vicariously liable for his negligent acts and omissions. Ms. Geary brought a claim for

1. All defendants except SLU and Dr. Bicalho subsequently were dismissed, without prejudice.

loss of consortium against SLU and Dr. Bicalho.

Trial was held on June 11 to 18, 2007. During voir dire, Mr. Sgroi and Ms. Geary's counsel asked, "Is anybody here an officer, director, or shareholder of an insurance company called The Doctor's Company?" SLU and Dr. Bicalho's counsel objected that the question was an "improper statement of the insurance question" and moved for a mistrial. The trial court sustained the objection, but denied their request for a mistrial.

During the presentation of evidence, Mr. Sgroi and Ms. Geary's orthopedic surgery expert, Dr. Tsourmas, testified that, to a reasonable degree of medical certainty, Mr. Sgroi had a non-displaced hip fracture on February 19, 2002, when he entered SLU Hospital. He stated that the standard of care required Dr. Bicalho to consider the possibility of a hip fracture and that Dr. Bicalho breached the standard of care by failing to do a hip examination and by failing to order a hip X–ray on that date. Dr. Tsourmas concluded that had Dr. Bicalho properly diagnosed the nondisplaced hip fracture on February 19, 2002, Mr. Sgroi could have had his broken hip pinned, which is a less drastic surgical procedure with a lower chance for infection. Because Mr. Sgroi's hip fracture was displaced when he subsequently sought care, he required hip replacement surgery, which was a more drastic surgical procedure with a higher chance for infection.

Mr. Sgroi's medical condition precluded him being present at trial and testifying.[2] Because of his absence, two videotapes of Mr. Sgroi were played for the jury. The first videotape was a deposition of Mr. Sgroi taken five weeks after his surgery to remove the hip prosthesis and two weeks before trial. The second videotape was a portion of a 2001 television news story about Mr. Sgroi, showing his condition after his recovery from his stroke but before the fall. SLU and Dr. Bicalho objected to the admission of the second videotape or, alternatively, requested that the videotape be limited in length and the audio eliminated because it was not practical, instructive, or calculated to assist the jury in understanding the case, it was irrelevant, it would inflame and prejudice the minds of the jury, and the persons speaking on the videotape could not be cross-examined. The trial court overruled the objection, in part, and sustained it, in part, and allowed a portion of the videotape to be played for the jury.

The jury returned a verdict in favor of Mr. Sgroi and Ms. Geary, awarding Mr. Sgroi $775,000 for his negligence claim and Ms. Geary $50,000 for her loss of consortium claim. The trial court entered judgment in accordance with the jury's verdict. SLU and Dr. Bicalho filed a motion for judgment notwithstanding the verdict or, in the alternative, a motion for new trial or, in the second alternative, a motion to amend the judgment. In support of these motions, the trial court permitted them to subpoena juror Demetrius Sims for an evidentiary hearing to address whether Mr. Sims had failed to disclose material information during voir dire. At the hearing on juror nondisclosure, Mr. Sims testified that he previously filed a lawsuit concerning an automobile accident and that he did not respond with that information during voir dire when asked by both plaintiffs' and defendants' attorneys if he had ever filed any kind of lawsuit. The trial court overruled SLU and Dr. Bicalho's post-trial motions, finding that the nondisclosure by

---

2. He was in an extended care facility and required a reclining wheelchair because he could not sit up at a right angle.

Mr. Sims was unintentional and not prejudicial.

█ SLU and Dr. Bicalho appeal. They present three issues on appeal. First, SLU and Dr. Bicalho argue that the trial court erred in admitting the videotape with audio, claiming the video was not practical, instructive, or calculated to assist the jury in understanding the case, constituted hearsay, served to inflame the jury, and contained out-of-court statements not subject to cross-examination.[3] Second, SLU and Dr. Bicalho assert that the trial court erred in denying their request for mistrial because Mr. Sgroi and Ms. Geary's counsel improperly, and in bad faith, injected insurance into the case, causing prejudice to SLU and Dr. Bicalho and resulting in an excessive verdict in favor of Mr. Sgroi and Ms. Geary. Third, SLU and Dr. Bicalho contend that the trial court erred in overruling their motion for new trial because of juror Sims' intentional nondisclosure of material information. After opinion by the court of appeals, this Court granted Ms. Geary's application for transfer.[4] Mo. Const. art. V, sec. 10.

## Admission of Videotape

SLU and Dr. Bicalho argue that the trial court erred in admitting the videotape of a news story about Mr. Sgroi. Mr. Sgroi and Ms. Geary offered the videotape to illustrate Mr. Sgroi's mobility and physical and mental health before the injuries allegedly caused by Dr. Bicalho's negligence.

The personal interest news story was about how Mr. Sgroi previously was forced to drop out of a state representative race due to a stroke and how he worked to recover so he could run for that office again. The news anchor and reporter discussed the seriousness of Mr. Sgroi's stroke and showed footage of him walking during a physical therapy session. In the video, Mr. Sgroi stated how the stroke gave him a better understanding of peoples' challenges, gave him a new perspective on the health care system, and inspired him to promote universal health care. Interviews were conducted with other people, including Mr. Sgroi's wife and his physician, who talked about his dedication to achieving his goals and, in particular, how hard he worked to recover from his stroke.

Before trial, SLU and Dr. Bicalho moved to preclude mention or evidence of the videotape or, in the alternative, to limit the videotape in length and eliminate its audio. They argued that the videotape was not practical, instructive, or calculated to assist the jury in understanding the case, it was irrelevant, the speakers on the video were not subject to cross-examination, and it served only to inflame and prejudice the minds of the jury. When the videotape was offered at trial, SLU and Dr. Bicalho objected to the videotape on the same grounds. When stating those grounds for objection, counsel informed the court that he did not object to all of the video, but he did object to the audio. Specifically, counsel stated:

> The defendant would not have an objection if a portion of the videotape was shown indicating Mr. Sgroi's physical abilities at the time. Although defendant would also note that this is before

---

**3.** SLU and Dr. Bicalho also claim on appeal that the videotape contains impermissible character evidence. This objection to the videotape was raised for the first time on appeal. A party may not raise or expand an objection to evidence on appeal that it did not make at trial. *Egelhoff v. Holt*, 875 S.W.2d 543, 549 (Mo. banc 1994). Therefore, the argument is not addressed.

**4.** Mr. Sgroi died while the case was on appeal. Ms. Geary, as personal representative of Mr. Sgroi's estate, was substituted for Mr. Sgroi.

the fall where he broke his shoulder, which further complicated his recovery. And even with that, defendant would not have an objection without the sound which would take care of the cross-examination objection, that a portion of the videotape could be shown indicating Mr. Sgroi's abilities at that time.

While the trial court excluded part of the video, it overruled SLU and Dr. Bicalho's objection to the remainder of video and permitted it to be viewed by the jury.[5]

 The basic principles that govern the admission of photographs also govern the admission of motion pictures or videotapes. *Morris v. E.I. Du Pont de Nemours & Co.*, 346 Mo. 126, 139 S.W.2d 984, 987 (1940). The party offering the videotape must lay the proper foundation and establish that it is an accurate, faithful representation of the place, person, or subject it purports to portray. *McPherson Redev. Corp. v. Watkins*, 782 S.W.2d 690, 691 (Mo.App.1989). "The fact that a videotape is taken before or after an event does not make it inadmissible if the extent of the changes are explained[.]" *Id.* at 692.

 "The trial court has broad discretion in assessing the admissibility of videotapes, and its ruling will not be disturbed on appeal absent an abuse of discretion." *Gomez v. Constr. Design, Inc.*, 126 S.W.3d 366, 374 (Mo. banc 2004). An abuse of discretion is a judicial act that is untenable and clearly against reason and that works an injustice. *Egelhoff v. Holt*, 875 S.W.2d 543, 549–50 (Mo. banc 1994). "Whether a videotape should be admitted or rejected depends on whether it is practical, instructive, and calculated to assist the trier of fact in understanding the case." *Gomez*, 126 S.W.3d at 374. In

addition, the trial court must balance the need and probative value of such evidence against any possible prejudicial effect that may result from its admission. *Id.* Trial courts are in a superior position to balance the probative value and prejudicial effect of evidence. *See Egelhoff*, 875 S.W.2d at 549.

SLU and Dr. Bicalho first argue that the trial court abused its discretion in admitting the videotape because there are only two types of videotapes that are practical, instructive, and calculated to assist the jury in understanding the case. For this principle, they rely on *Grose v. Nissan N. Am. Inc.*, 50 S.W.3d 825 (Mo.App.2001). In *Grose*, the court articulated "two essential purposes" for allowing the admission of videotapes as evidence: (1) to recreate events at issue in the litigation, and (2) to illustrate confusing and complex physical properties or scientific principles that form the foundation of an expert's opinion. *Id.* at 830. SLU and Dr. Bicalho argue that the nature of the newscast video does not fall within these two purposes, so it should have been excluded.

The "two essential purposes" listed in the *Grose* opinion are not an exhaustive list of all of the purposes for admitting videotapes as evidence. To the contrary, this Court has held that trial courts did not abuse their discretion in admitting videos for other evidentiary purposes. In *Gomez*, the Court affirmed the trial court's admission of a videotape showing the condition of an accident site at the time the accident occurred. 126 S.W.3d at 374. In *Egelhoff*, the Court affirmed when a trial court allowed a videotape of the plaintiff dancing and playing billiards one and a half years after an accident caused by defendants'

---

5. The portion of the video excluded contained the news reporter's comments about Mr. Sgroi's goal to run for the state house of representatives, his confirmation that he in-

tends to run, and the news anchor's closing comments about Mr. Sgroi's problems with his insurance carrier.

negligence to rebut her claims of injury. 875 S.W.2d at 550. The court of appeals also has held a trial court did not abuse its discretion when it admitted a day-in-the-life video because the plaintiff's ill health prevented the plaintiff from being present in court and being observed by the jury. *Lawton v. Jewish Hosp. of St. Louis,* 679 S.W.2d 370, 372 (Mo.App.1984).[6]

■ As these cases demonstrate, the proper inquiry is whether the video is practical, instructive, and calculated to assist the trier of fact in understanding the case. *Gomez,* 126 S.W.3d at 374. SLU and Dr. Bicalho claim that the video was not instructive to the jury because it does not accurately reflect Mr. Sgroi's physical condition at the relevant time. They assert that the video fails to reflect his condition after his fall in December 2001, which was his condition at the time of the negligent act in February 2002. This Court agrees that the video does not accurately reflect his condition at the relevant time, but the difference in his condition does not make the video inadmissible. *See McPherson Redev. Corp.,* 782 S.W.2d at 691. The video is still admissible, but the difference in Mr. Sgroi's condition must be explained. *Id.* The difference could have been explained by plaintiffs laying a proper foundation at trial for admission of the videotape. *Id.* Plaintiffs did not do so. There was no testimony explaining the difference between Mr. Sgroi's physical ability or mental acuity when the video was made in 2001 and his condition at the time of the negligent act in February 2002.

Plaintiffs' failure to lay the proper foundation and explain differences in Mr. Sgroi's physical condition does not aid SLU and Dr. Bicalho, however. When SLU and Dr. Bicalho objected to the ad-

mission of the video at trial, they noted the difference in Mr. Sgroi's physical condition from the time the negligence occurred but then made statements indicating that they were not objecting on that basis. Instead, they stated that their objection was really to the audio, which has nothing to do with whether the video was an accurate portrayal of Mr. Sgroi's physical condition. Additionally, their motion for new trial did not include the claim that the video does not accurately reflect Mr. Sgroi's physical condition at the time of the negligence. Because the issue was not preserved for appeal, this Court will not address this argument. *Egelhoff,* 875 S.W.2d at 549.

In reviewing whether the video was practical, instructive, and calculated to assist the jury, this Court must consider whether the trial court abused its discretion in admitting the video. In doing so, the video must be discussed in segments- Mr. Sgroi walking during physical therapy, Mr. Sgroi speaking about his recovery and goals, and other persons speaking about Mr. Sgroi.

■ The segment showing Mr. Sgroi walking with a health care provider during physical therapy was offered to assist the jury in understanding the nature of Mr. Sgroi's injuries. The effect of the alleged negligence on Mr. Sgroi's mobility is a primary factor in his claim for damages. In this segment, the jury could observe Mr. Sgroi walking with a walker and moving about in his wheelchair. This evidence offered the jury valuable insight into Mr. Sgroi's physical and mental abilities after his stroke but before the negligent act. The segment of Mr. Sgroi walking is practical, instructive, and calculated to assist the jury in understanding Mr. Sgroi's

6. This Court also has given deference when trial courts exercise their broad discretion to exclude day-in-the-life videos of injured plaintiffs because the plaintiffs were present in court and could be observed by the jury. *Helm v. Wismar,* 820 S.W.2d 495, 497 (Mo. banc 1991); *Haley v. Byers Transp. Co.,* 414 S.W.2d 777, 780 (Mo.1967).

physical condition and the quality of Mr. Sgroi's life before the alleged negligence. The trial court reasonably concluded that this portion of the videotape was more probative than prejudicial, as it would assist the jury in fairly determining the full extent of Mr. Sgroi's injuries for purposes of assessing damages.

 With regard to the segments containing statements by Mr. Sgroi and others, SLU and Dr. Bicalho argue that these statements should have been excluded because they are hearsay and served only to inflame and prejudice the minds of the jury.[7] A hearsay statement is an out-of-court statement offered for the truth of the matter asserted therein and "depends on the veracity of the statement for its value." *State v. Johnson*, 284 S.W.3d 561, 584 (Mo. banc 2009). Hearsay evidence is objectionable because the person who makes the statement offered is not under oath and is not subject to cross-examination. *Bartlett v. Kansas City Pub. Serv. Co.*, 349 Mo. 13, 160 S.W.2d 740, 742 (1942). Hearsay is inadmissible unless it fits into a recognized exception, *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007), or it is used for a nonhearsay purpose. *State v. Foust*, 920 S.W.2d 949, 954 (Mo.App.1996). A nonhearsay purpose includes offering the statement not for the truth of the matter asserted, but for some other purpose. *See Johnson*, 284 S.W.3d at 584.

The portion of the video in which Mr. Sgroi spoke was offered for a nonhearsay purpose. It was not offered for the truth of the matter asserted—that Mr. Sgroi was more sensitive to others because of his stroke and that he believed health care was a human right that he wanted to promote—but to demonstrate his mental abilities and attitude before his hip surgery and subsequent recovery. Such evidence was relevant and admissible. Due to Mr. Sgroi's poor physical condition, his only opportunity to testify on his own behalf was through the video deposition recorded two weeks before trial and shortly after he had surgery to remove the hip prosthesis. The video deposition, however, did not convey Mr. Sgroi's physical and mental abilities before the alleged negligent act. The video deposition only displayed Mr. Sgroi's poor, post-surgery physical condition where his cognitive functions were impaired by pain medication. The audio allowed the jury to observe that Mr. Sgroi was articulate, vivacious, and enthusiastic about life. These are relevant to the issue of the injury Mr. Sgroi suffered as well as to his mental abilities. It also countered SLU and Dr. Bicalho's suggestion in their opening statement that Mr. Sgroi's current condition resulted from his stroke and other physical ailments rather than any negligence. The trial judge could reasonably believe Mr. Sgroi's statements on the videotape were not being submitted for hearsay purposes, but rather to show Mr. Sgroi's mental acuity and attitude.

 The remaining portion of the video—which contains the news anchor's introductory remarks, the news reporter's commentary, and comments by the physical therapist, Ms. Geary, and Mr. Sgroi's doctor—includes out-of-court statements that have no nonhearsay purpose and do not fit within any exception to the hearsay rule. Because the remaining portion of the video included inadmissible hearsay, the trial court erred in admitting it.

 The improper admission of hearsay evidence requires reversal if such evidence was prejudicial. *In re A.A.T.N.*, 181 S.W.3d 161, 170 (Mo.App.2005). SLU

---

7. Although SLU and Dr. Bicalho did not expressly state at trial that their objection was hearsay, the record shows that the objection that the speakers were not subject to cross-examination sufficiently brought the hearsay issue to the trial court's attention.

and Dr. Bicalho claim prejudice from the admission of statements that Mr. Sgroi worked very hard to recover after his stroke and that he intended to run for election in the future. They argue these statements created sympathy for Mr. Sgroi and served to inflame the minds of the jury.

The improperly admitted hearsay evidence was not prejudicial because it was cumulative to other evidence admitted without objection. Cumulative evidence is additional evidence that reiterates the same point. *Burns v. Elk River Ambulance, Inc.*, 55 S.W.3d 466, 483 (Mo.App. 2001). "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 590 (Mo. App.2008). Statements by the physical therapist, Ms. Geary, and Mr. Sgroi's doctor that he worked hard to recover from his stroke were cumulative to Ms. Geary's subsequent testimony that Mr. Sgroi worked very hard to recover after his stroke. Statements by the news anchor and news reporter that Mr. Sgroi intended to run for state representative were cumulative to Mr. Sgroi's deposition testimony that he intended to run for election in the future. The subsequent testimony by Ms. Geary or Mr. Sgroi was admitted without objection. Therefore, SLU and Dr. Bicalho were not prejudiced by the erroneous admission of the hearsay statements on the video.

### Insurance Question

■ SLU and Dr. Bicalho next assert that the trial court erred in denying their request for a mistrial because Mr. Sgroi and Ms. Geary's counsel improperly, and in bad faith, injected insurance into the case by identifying The Doctors Company as an insurance company in a question during voir dire. SLU and Dr. Bicalho argue that the improper question caused prejudice to them and resulted in an excessive verdict in favor of Mr. Sgroi and Ms. Geary.

■ "This Court has held that the constitutional right to a trial by jury includes the right to a fair and impartial jury." *Ivy v. Hawk,* 878 S.W.2d 442, 444 (Mo. banc 1994). Parties have a right to know if jurors or their families have an interest in the outcome of the litigation, and the trial court "has no discretion to deny a party the right to ask the preliminary 'insurance question' if the proper foundation is laid." [8] *Id.* Counsel has laid a proper foundation when he or she requests, prior to voir dire and on the record, that he or she be permitted to ask the "insurance question." *Id.*

■ The accepted procedure in Missouri for asking the preliminary "insurance question" is as follows: "1) first getting the judge's approval of *the proposed question* out of the hearing of the jury panel, 2) asking only one 'insurance question,' and 3) not asking it first or last in a series of questions so as to avoid unduly highlighting the question to the jury panel." *Id.* at 445 (Emphasis added). The accepted procedure for asking the preliminary insurance question requires counsel to specifically state to the trial judge the question that will be asked of the venire panel. *Id.* The form of the question is at the trial court's discretion, but "it generally encompasses whether any members of the panel or their families work for or have a financial interest in the named insurance company." *Id.* Identifying the company in the question as an insurance company when the name of the company does not include the word "insurance" improperly and unnecessarily highlights the issue of insurance. *Id.* at 445 n. 1.

---

8. Follow-up questions are at the discretion of the trial court. *Ivy,* 878 S.W.2d at 446.

Here, out of the presence of the venire panel, Mr. Sgroi and Ms. Geary's counsel advised the court that he wanted to ask the insurance question. Counsel asked only one question, and it was not the first or last question in voir dire. Counsel failed, however, to get the judge's approval of the specific question he asked. Counsel asked, "Is anybody here an officer, director, or shareholder of *an insurance company* called The Doctor's Company?" (Emphasis added). SLU and Dr. Bicalho objected that it was an improper question and requested a mistrial. The trial court sustained the objection but denied their request for a mistrial.

SLU and Dr. Bicalho assert that "the precise wording of the specific question was never discussed and thus [Mr. Sgroi and Ms. Geary] did not follow the proper procedure to obtain the judge's approval of the proposed 'insurance question' out of the hearing of the panel." SLU and Dr. Bicalho contend that because Mr. Sgroi and Ms. Geary's question identified The Doctors Company as an insurance company, the question improperly highlighted the insurance issue and a mistrial was required.

SLU and Dr. Bicalho are correct in their understanding that *Ivy* requires a party who wants to ask the insurance question to explicitly recite to the trial court the question to be asked. 878 S.W.2d at 445. *Ivy* also stands for the proposition that the word "insurance" should not be injected into the question when not a part of the insurance company's name. *Id.* However, *Ivy* does not require a declaration of a mistrial if the accepted procedure for asking the insurance question is not followed precisely. *See id.*

When the proper procedure is not followed, it is within the trial court's discretion whether to grant a mistrial due to a reference to insurance, and such decisions will not be disturbed absent a manifest abuse of discretion. *Taylor v. Republic Auto. Parts, Inc.*, 950 S.W.2d 318, 321 (Mo.App.1997). To establish a manifest abuse, there must be a grievous error where prejudice otherwise cannot be removed. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867 (Mo. banc 1993). Although the insurance question omits the word "insurance" where it can, mere use of the word "insurance" does not alone warrant reversal or a mistrial.[9] *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787 (Mo.1977).

When determining whether a mistrial is required, the trial court should focus on whether the question is asked in good faith. *Callahan*, 863 S.W.2d at 871. If an insurance question is asked not in good faith, but for the purpose of injecting insurance coverage into the minds of the jurors, the ensuing prejudicial effect deprives the defendant of his right to a fair trial. *Id.* If the mention of insurance was in good faith, the trial court must decide if the improper highlighting of insurance prejudiced the jury.[10] The trial court is in a

---

9. In *McCaffery v. St. Louis Pub. Serv. Co.*, this Court held that it was improper to characterize Transit Casualty Company as an insurance company. 363 Mo. 545, 252 S.W.2d 361, 367 (1952). However, this Court believed that "this characterization in the one general question ... under the circumstances of this case could not have been prejudicial or certainly not so prejudicial as to convict the trial court of an abuse of discretion in refusing to discharge the jury because of the question."

*Id.* This Court deferred to the trial court's judgment, recognizing that it "was in a position to know." *Id.*

10. *Id.* Because a party is allowed to ask the proper, preliminary insurance question as a matter of right, parties need not prove prejudice if denied the right to ask the question. *Ivy*, 878 S.W.2d at 446. The prejudice that could result from not asking a proper, preliminary insurance question outweighs any preju-

superior position than an appellate court to determine if a question was motivated by good or bad faith or if there was any prejudicial effect on the jury. *Taylor,* 950 S.W.2d at 321.

In the present case, SLU and Dr. Bicalho point to no evidence that supports their claim that the insurance question was asked in bad faith beyond the fact that counsel used the words "insurance company." Other portions of the record support a finding that counsel's use of the word "insurance" was not done in bad faith. First, counsel attempted to follow the accepted procedure and requested permission from the trial court to ask the insurance question. Second, when SLU and Dr. Bicalho requested a mistrial, the following discussion occurred out of the hearing of the jury:

[Mr. Sgroi's and Ms. Geary's counsel]: Judge, we talked about this in chambers . . .

The Court: Whoa, whoa. We didn't say what question you were going to ask. I assumed that you were aware of the insurance question.

[Mr. Sgroi's and Ms. Geary's counsel]: Well, I don't think that I agree you can't identify it as an insurance company.

From this dialogue, the trial court could have found that counsel did not know that the word "insurance" should not be used, if at all possible, in the insurance question. Counsel's misunderstanding of the law supports a finding that counsel did not act in bad faith. With evidence that supports the trial court's finding of no bad faith, this Court must defer to the trial court which was in the best position to recognize bad faith or prejudice.

SLU and Dr. Bicalho make two other arguments that the record shows prejudice that requires a mistrial. First, they point to venireperson Grohman's repeated

references to insurance that occurred after plaintiffs' counsel asked the insurance question. However, all of these comments about insurance logically followed from questions about tort reform, medical malpractice, and putting a price on pain and suffering. SLU and Dr. Bicalho did not object to these questions, although they did renew their request for mistrial after Mr. Grohman stated that the insurance company would be paying any jury award for damages. The trial court was not compelled to believe that Mr. Grohman's references to insurance resulted from the improper insurance question. Mr. Grohman's references to insurance more likely were generated by the questions on tort reform and medical malpractice than the insurance question. The trial court did not abuse its discretion in remedying the situation by permitting Mr. Grohman to be stricken for cause rather than declaring a mistrial.

Second, SLU and Dr. Bicalho contend that the jury's verdict was excessively high due to this injection of insurance into the case. They offer no support for this assertion. An award of $775,000 was not excessively high compensation to a fifty-five-year-old who suffered excruciating pain during the seven weeks between Dr. Bicalho's failure to diagnose the hip fracture and the resulting hip surgery, who undertook years of rehabilitation to recover his ability to walk, and who then lost his hip joint, which permanently deprived him of the ability to walk. The trial court did not abuse its discretion in denying SLU and Dr. Bicalho's request for mistrial. Because counsel did not inject "insurance" in bad faith and there was no grievous error where prejudice could not otherwise be removed, the trial court did not abuse its discretion by denying a mistrial.

dice that results from it. *Id.* at 444; *Calla-*

*han,* 863 S.W.2d at 871.

## Juror Nondisclosure

 SLU and Dr. Bicalho finally contend that the trial court erred in overruling their motion for a new trial because of intentional nondisclosure of material information by juror Demetrius Sims. Mr. Sims did not disclose that he had filed a lawsuit for injuries from an automobile accident. SLU and Dr. Bicalho contend that Mr. Sims' failure to respond to unequivocal questions requesting information about filing lawsuits was intentional nondisclosure and *per se* prejudicial, so they are entitled to a new trial.

 In determining whether to grant a new trial for juror nondisclosure, the court first must determine whether a nondisclosure occurred at all. *State v. Mayes*, 63 S.W.3d 615, 625 (Mo. banc 2001). Nondisclosure can occur only after a clear question is asked during voir dire. *Brines By Harlan v. Cibis*, 882 S.W.2d 138, 139 (Mo. banc 1994). An unequivocal question triggers a venireperson's duty to disclose. *Id.* Silence to an unequivocal question establishes juror nondisclosure if the information is known to the juror.[11] *Id.; Heinen v. Healthline Mgmt., Inc.*, 982 S.W.2d 244, 248 (Mo. banc 1998).

During voir dire, plaintiffs' counsel asked, "Could you raise your hand if you've ever filed any kind of lawsuit before? Not just a medical case but automobile accident, anything like that, filed a lawsuit, could you raise your hand?" Eleven venirepersons answered and described the lawsuits they had filed. Three persons answered that they had filed lawsuits for automobile accidents. Mr. Sims did not raise his hand or otherwise respond during this questioning.

Later during voir dire, SLU and Dr. Bicalho's counsel also asked about filing lawsuits. Counsel stated that the filing of a lawsuit is accomplished by merely filing a piece of paper with the clerk and paying the fee. He then asked, "[H]ave all of you told us any time that you have ever filed a lawsuit against anyone else [other than a family law case]?" After an inquiry whether the question included lawsuits filed in the course of employment, counsel for SLU and Mr. Bicalho again inquired, "Anyone else here ever filed a lawsuit on behalf of yourself or a close family member that we haven't already heard about?" Mr. Sims did not raise his hand or otherwise respond.

At the post-trial hearing, Mr. Sims testified that he had filed a lawsuit for injuries from an automobile accident and he did not reveal that fact during voir dire. Because the questions asked by plaintiffs' and defendants' counsel were clear and unequivocal, the questions triggered Mr. Sims' duty to disclose. His silence to those unequivocal questions was juror nondisclosure.

 Once nondisclosure is established, it must be determined whether the nondisclosure was intentional or unintentional. *Mayes*, 63 S.W.3d at 625. This determination is left to the sound discretion of the trial court. *Williams By Wilford v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987). Intentional nondisclosure occurs: "1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it

---

11. A venireperson only is required to disclose what the venireperson knows. Silence to a clear question is a full disclosure if the venireperson lacks sufficient knowledge of the matter in order to answer the question. *Heinen v. Healthline Mgmt., Inc.*, 982 S.W.2d 244, 248 (Mo. banc 1998) (juror fully disclosed despite failing to answer a question about a lawsuit to which he was party because he was unaware of the lawsuit).

was of such significance that his purported forgetfulness is unreasonable." *Id.* "Unintentional nondisclosure exists where, for example, the experience forgotten was insignificant or remote in time, or where the [venireperson] reasonably misunderstands the question posed." *Id.*

"[B]ias and prejudice will normally be presumed if a juror intentionally withholds material information." *Mayes,* 63 S.W.3d at 625. Accordingly, a finding of intentional nondisclosure of a material issue is tantamount to a *per se* rule mandating a new trial. *Heinen,* 982 S.W.2d at 248. However, if nondisclosure was unintentional, "a new trial is not warranted unless prejudice resulted from the nondisclosure that may have influenced the jury's verdict." *Mayes,* 63 S.W.3d at 625. In the case of unintentional nondisclosure, the party seeking the new trial has the burden of proving prejudice. *Heinen,* 982 S.W.2d at 250. Moreover, the record must support all allegations of nondisclosure and prejudice. *Id.* at 248, 250. The trial court's findings are "given great weight and will not be disturbed on appeal unless the trial court abused its discretion." *Brines,* 882 S.W.2d at 139.

The trial court's ruling on SLU and Dr. Bicalho's claim of juror nondisclosure was made after a post-trial evidentiary hearing. At that hearing, Mr. Sims testified that he filed a prior lawsuit for personal injuries from an automobile accident and the suit was settled out of court. He testified that if he had heard the question asking potential jurors whether they ever were involved in a lawsuit, he would have disclosed his prior filing. He stated that he must have missed the question or he would have answered. He further testified that he had not thought about his prior settlement when considering the facts of this case.

In its order denying SLU and Dr. Bicalho's post-trial motions, the trial court ex-pressly found Mr. Sims' testimony to be credible based on his demeanor during the post-trial hearing. The trial court believed Mr. Sims' mind may have wandered or he was not paying attention at the time "the question" about prior lawsuits was asked. Although this Court gives great weight to the trial court's findings, the record does not support the finding by the trial court that Mr. Sims reasonably failed to answer because of inattention. While it might have been reasonable for Mr. Sims to miss a single question, in this case, there were multiple unequivocal questions about filing a lawsuit and numerous answers in response. It is not reasonable to believe that Mr. Sims' mind wandered or that he was not paying attention during the entire time of multiple questions about filing lawsuits being asked and answered.

Because there was no reasonable inability of Mr. Sims to comprehend the information solicited by the questions asked, the second prong of the intentional disclosure inquiry requires consideration of whether Mr. Sims actually remembered the experience of filing the lawsuit or whether it was of such significance that his purported forgetfulness is unreasonable. *Williams,* 736 S.W.2d at 36. If it is found that he either remembered or should have remembered that he filed a lawsuit, his nondisclosure would be found intentional and *per se* prejudicial, requiring a new trial. *Id.* at 37.

Evidence in the record supports a finding that Mr. Sims perceived his automobile-accident lawsuit as insignificant, so his forgetfulness was reasonable. This case differs from *Brines,* where this Court found a juror's failure to disclose in a medical malpractice suit that he had been sued on eight occasions, seven times by doctors to collect for medical services, compelled a finding that it was intentional nondisclosure. 882 S.W.2d at 139. In this case, Mr. Sims filed his one lawsuit six

years before he served as a juror in this case. The lawsuit was for negligence in an automobile accident, rather than for medical negligence like the suit at issue. The suit was settled and did not go to trial, and Mr. Sims received the nominal amount of $1,800 from the settlement. Mr. Sims did not remember the names of the defendant or his attorney in the matter until the names were mentioned in questioning at the post-trial hearing. These facts support the finding that the Mr. Sims' nondisclosure resulted from the insignificance of the lawsuit to Mr. Sims, so his failure to remember his lawsuit during the trial was reasonable and his nondisclosure unintentional.

Because the record supports the trial court's finding that Mr. Sims' nondisclosure was unintentional, SLU and Dr. Bicalho have the burden of proving prejudice resulting from the nondisclosure that may have influenced the jury's verdict. *Mayes,* 63 S.W.3d at 625; *Heinen,* 982 S.W.2d at 250. In this case, the trial court expressly found there was no prejudice from Mr. Sims' unintentional nondisclosure. Like other findings of fact, the trial court's finding of a lack of prejudice will be disturbed on appeal only for abuse of discretion. *Anglim v. Mo. Pac. R.R. Co.,* 832 S.W.2d 298, 306 (Mo. banc 1992). "Only when the appellate court is convinced from the totality of the circumstances that the right to a fair trial and the integrity of the jury process has been impaired should the trial court be found to have abused discretion." *Id.*

The trial court's finding of no prejudice was based on its belief that Mr. Sims' testimony at the post-trial hearing was credible and that he was not withholding relevant information intentionally because he responded to a voir dire question regarding whether anyone had ever broken a leg. The trial court further believed that Mr. Sims had no reason or motivation to conceal the lawsuit and that his prior litigation did not play a role in his deliberations; therefore, a new trial was not warranted.

The mere fact that Mr. Sims filed a previous personal injury lawsuit for injuries suffered in an automobile accident does not demonstrate he was prejudiced against SLU and Dr. Bicalho. Moreover, SLU and Dr. Bicalho did not attach much significance to the filing of this type of lawsuit. They did not even question the venirepersons who responded that they previously filed lawsuits for injuries suffered in automobile accidents.

SLU and Dr. Bicalho have not shown that the trial court abused its discretion in determining that Mr. Sims' nondisclosure was unintentional and not prejudicial. The record supports the trial court's determination. Looking at the totality of the circumstances, this Court does not find that SLU and Dr. Bicalho's right to a fair trial and an impartial jury was compromised. Therefore, the trial court did not abuse its discretion by overruling their motion for a new trial.

### Conclusion

SLU and Dr. Bicalho were not prejudiced by the erroneous admission of videotape evidence. The trial court did not abuse its discretion in denying a mistrial because of an improper insurance question or in overruling a motion for a new trial for unintentional juror nondisclosure. Therefore, the trial court's judgment is affirmed.

PRICE, C.J., TEITELMAN, RUSSELL, FISCHER and STITH, JJ., and PARRISH, Sr.J., concur.

WOLFF, J., not participating.